**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> DAVID TACHAY HEARD, <br><br> Defendant. | No. 17-CR-83-LRR <br><br> **REPORT AND RECOMMENDATION TO DENY DEFENDANT'S MOTION TO SUPPRESS** |

## I. INTRODUCTION

This matter comes before me on defendant's motion to suppress evidence allegedly obtained in violation of the Fifth Amendment to the United States Constitution. (Doc. 21). A grand jury indicted defendant, charging him with four offenses: Count 1 charges him with being a felon in possession of a firearm; Count 2 charges him with possession with the intent to distribute a controlled substance; Count 3 charges him with possession of a firearm in furtherance of a drug trafficking offense, and; Count 4 charges him with being in possession of a stolen firearm. (Doc. 27). These charges arose from an eyewitness's identification of defendant. Defendant argues that police used an impermissibly suggestive show-up technique to have the eyewitness identify defendant at the scene of the crime. On November 26, 2017, the government timely filed its resistance to the motion. (Doc. 33).

The Honorable Linda R. Reade, United States District Court Judge, referred this motion to me for a Report and Recommendation. On December 1, 2017, I held an evidentiary hearing on the motion. The government called Cedar Rapids Police

Department officers Shawn Burke and John O'Brien. I also admitted the government's exhibits 1 through 5. Exhibits 2, 3 and 4 were admitted over defendant's relevancy objections. Exhibit 1 contains a recording of 9-1-1 calls. Exhibits 2 & 3 contain recordings of statements the witness made on the telephone to another person about his identification of defendant. Exhibit 4 is a recording of a jail house call between defendant and defendant's girlfriend regarding what he was wearing the night of the accident. Exhibit 5 is Officer Burke's Call for Service Report. I also had Officer Burke draw a diagram of the scene at the time of the show-up identification and admitted it as Court's Exhibit 1.

For the reasons that follow, I respectfully recommend the Court **deny** defendant's motion to suppress.

## II. FINDINGS OF FACT

On the evening of July 30, 2017, defendant was in a car accident. A woman drove the other car. The accident occurred near the interchange of Glass Road and Interstate 380 in Cedar Rapids, Iowa. The Cedar Rapids Police Department received several 9-1-1 calls, including one from J.S., a civilian. J.S. was a passenger in the front seat of a car driven by his wife. They were traveling south on Redbud Road. The car in which J.S. was a passenger was not involved in the accident. Defendant's car was parked in the northbound lane of Redbud. J.S. and his wife passed by defendant's vehicle and proceeded to the stop sign at the corner of Glass Road. (*See* Court Exhibit 1).[1]

At approximately 7:16 PM, J.S. called 9-1-1 and reported seeing a "shorter" black male with a white hat and darker clothes involved in the accident throw a gun in the ditch on Redbud. J.S. described the person as "parked on Redbud right at the end of the fence." Exhibit 5. The testimony of Officer Burke established that there are a couple of

---

[1] Defendant's vehicle is marked with the letter S, and the stop sign is reflected with a circle around the letter s.

groups of trees near the ditch on Redbud. J.S. did not indicate in the call where exactly the black male threw the gun. Defendant stands five foot, eight inches tall.

Officer Burke was dispatched to the scene at 7:53 PM and arrived at 8:02 PM. Exhibit 5. He may not have been the first officer at the scene. Officer Burke saw defendant at the scene. Defendant wore dark clothes.[2] Based on J.S.'s call, officers searched the ditch on Redbud. At 8:13 PM, officers found a package of marijuana, and at 8:25 PM they found a handgun. Defendant was arrested and placed in the back of Police Sergeant Omar's squad car. (*See* Court Exhibit 1; Officer Omar's car is marked as "P sgt").

Another officer then called J.S. and asked him to return to the scene to make an identification of the suspect. J.S. drove alone to the scene and arrived at approximately 8:49 PM. It was dusk. J.S. parked behind Officer Burke's patrol car, which was parked on Glass Road, near the corner of Redbud Road. (*See* Court Exhibit 1; Officer Burke's car is marked as "P me," and J.S.'s car is marked with an "x W"). Officer Burke approached J.S.'s car and spoke with J.S. through the driver's side window. After Officer Burke determined that J.S. was the eyewitness, Officer Burke used the passenger-side spot light on his squad car to illuminate the side of Officer Omar's car and had Officer Omar turn off the flashing yellow lights on her car so as to increase visibility. Officer Omar removed defendant from the back right passenger seat of her patrol car and had him stand and face J.S.'s car, holding onto defendant's arm. (See Court Exhibit 1; defendant's location next to the car is marked with an x; the arrow from Officer Burke's car depicts the direction of the spot light). Defendant was handcuffed behind his back.

---

[2] Although Officer Burke did not explicitly testify that defendant was wearing dark clothing when Officer Burke encountered defendant at the scene, Officer Burke did testify that defendant generally matched the description given by J.S.

Officer Burke indicated the distance from J.S. to defendant was approximately 20 to 25 feet.

Officer Burke then said something about having someone in custody or having a suspect and that they wanted to see if J.S. believed it was the same person he saw throwing something into the woods.[3] Officer Burke testified that J.S. did not hesitate in stating that defendant was the person he saw earlier. J.S. added a caveat, however, that the person he had seen earlier was wearing a white hat and the individual before him was not. Officer Burke yelled to Officer Omar that the witness had identified the suspect and she could place defendant back in her squad car. Officer Burke then obtained some additional identifying information from J.S., who then left the scene.

After J.S. left the scene, officers reached him again by telephone and asked him to come down to the police station to provide some additional information about what he saw that night. Although J.S. expressed frustration because he had other things he wanted to do, he complied and later met with officers at the police station.

The following day, July 31, 2017, defendant called his girlfriend from the Linn County Jail. During the recorded call, defendant stated he could not be identified because he had put his white hat in the car.

About a month and a half later, on September 14 and 15, 2017, Kendra Hatcher, an acquaintance of defendant, called J.S. about his status as a witness. Exhibits 2 & 3. During the phone calls, J.S. indicated that he was certain of his identification of defendant as the person he saw disposing of the gun.

### III.    ANALYSIS

Defendant alleges the government used such an unduly suggestive identification procedure that the Court should suppress the evidence. Law enforcement officers are not

---

[3] Officer Burke could not recall his exact wording and the parties did not offer into evidence a recording of the encounter although, apparently, one may exist.

required to use in-person line-ups or photo line-ups when they have the opportunity for a "quick, on-the-scene identification." *United States v. King*, 148 F.3d 968, 970 (8th Cir. 1998); *United States v. Frazier*, No. CR00–1003, 2000 WL 34030841, at *4 (N.D. Iowa Apr. 20, 2000). "Such identifications are essential to free innocent suspects and to inform the police if further investigation is necessary." *Frazier*, 2000 WL 34030841, at *4 (citing *King*, 148 F.3d at 970). However, a show-up identification is "the most suggestive, and therefore the most objectionable method of pre-trial identification." *United States v. Henderson*, 719 F.2d 934, 937 (8th Cir. 1983) (citation and internal quotation marks omitted). Indeed, "one-man showups have been criticized as "inherently suggestive and a practice to be avoided." *Brodnicki v. City of Omaha*, 75 F.3d 1261, 1265 (8th Cir. 1996) (citation and internal quotation marks omitted).

To show that a show-up identification violates the Due Process Clause, however, defendant must first demonstrate that the identification procedures used by the police were unduly suggestive. *Stovall v. Denno*, 388 U.S. 293 (1967); *see also United States v. Donahue*, 948 F.2d 438, 441 (8th Cir. 1991). Courts have found some show-up identifications unduly suggestive and others not, depending on the circumstances. *Compare, e.g.*, *Clark v. Caspari*, 274 F.3d 507, 509, 511-12 (8th Cir. 2001) (finding the show-up identification unduly suggestive where the defendants were handcuffed face down on a driveway with an officer standing over them with a shotgun), *United States v. Hadley*, 671 F.2d 1112, 1115 (8th Cir. 1982) (finding the show-up was "admittedly suggestive in that it was preceded by a report to the institution that the robber had been caught, in the presentation of the appellant in handcuffs surrounded by police officers, and in the collective viewing by witnesses"), *with United States v. Pickar*, 616 F.3d 821, 828 (8th Cir. 2010) (relying on *United States v. Martinez* and finding the show-up "was not unduly suggestive" even though the defendant "was handcuffed and standing in front of a marked police cruiser . . . [and the defendant] stood between an officer in uniform

5

and an officer in plainclothes, with one of the officers shining a small flashlight in Pickar's face"), *United States v. Martinez*, 462 F.3d 903, 911 (8th Cir. 2006) (finding the show-up identification was not unduly suggestive, even though the defendant had been handcuffed, had been driven to the bank in a police car, stood on a sidewalk, and police officers were present), and *United States v. Woody*, 690 F.2d 678, 680 (8th Cir. 1982) (finding the show-up was not unduly suggestive when the defendant was sitting handcuffed, inside of a police van, with only a uniformed officer present because of the identifying witness's "opportunity to clearly observe the [defendants], their direct dealing with [the witness] at the time of the offense, his prior description of the [defendants], the certainty of his identification, and the short time between the [offense] and his identification").

If defendant makes the showing that the show-up identification was unduly suggestive, the Court must then determine whether "under the totality of the circumstances of the case, the suggestive confrontation created 'a very substantial likelihood of irreparable misidentification.'" *Graham v. Solem*, 728 F.2d 1533, 1541 (8th Cir. 1984) (quoting *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977) (citation and internal quotation marks omitted). *See also United States v. Jones*, 535 F.3d 886, 891 (8th Cir. 2008) (holding that "'[a]n identification is unreliable if its circumstances create a very substantial likelihood of irreparable misidentification.'" (quoting *Martinez*, 462 F.3d at 910)). In other words, the second step of the analysis focuses on whether the identification is reliable under the "totality of the circumstances," not just on the nature of the show-up itself. *Hadley*, 671 F.2d at 1115. The reliability inquiry is the linchpin in determining the admissibility of identification evidence. *Hadley*, 671 F.2d at 1115. When considering the reliability of an identification, the Court considers the following factors:

> 1) the opportunity of the witness to view the criminal at the time of the crime, 2) the witness' degree of attention, 3) the accuracy of the witness' prior description of the criminal, 4) the level of certainty demonstrated by the witness at the confrontation, 5) and the length of time between the crime and the confrontation.

*Graham*, 728 F.2d at 1541–42 (quoting *Neil v. Biggers*, 409 U.S. 188, 199–200 (1972)) (enumerations added).

Considering the circumstances of this show-up identification, I do not find that it was unduly suggestive. There is no evidence in the record that when officers called J.S. back to the scene for the identification they told him anything suggestive about the identification. In other words, they did not say they had caught the person or that they thought they found the man he saw. Rather, officers ask J.S. if he could identify a suspect. When J.S. arrived to conduct the identification, the testimony again was that Officer Burke did not say anything suggestive to J.S. Rather, Officer Burke simply asked J.S. to see if he could identify defendant as the person he previously saw disposing of the firearm. Although defendant was removed from a police vehicle and an officer was holding his arm at the time, that alone did not make the circumstances unduly suggestive. Therefore, although the method was suggestive, I do not find the show-up identification was so unduly suggestive as to violate defendant's due process rights.

Even if the show-up method used in this case is found by a reviewing court to have been unduly suggestive, I find the totality of the circumstances of the identification nevertheless shows the identification to be reliable under the *Biggers* factors. It is uncertain how much time J.S. had to observe the suspect when J.S. first saw him. Based on the testimony, it could have been a matter of a few seconds, or it could have been as long as several minutes. Neither J.S., nor his wife, testified as to when they first came into view of the suspect, how fast they were traveling, how long they stopped at the stop sign, or J.S.'s line of sight. Similarly, there was no evidence regarding the degree of

attention J.S. devoted to looking at the suspect when J.S. first observed defendant. The Court is left to speculate as to the opportunity to observe and degree of attention factors. Because the burden is on the government, I must find these two factors weigh against finding the identification reliable.

The remaining factors, however, weigh in favor of finding the identification reliable. In particular, the accuracy of J.S.'s prior description of defendant, the level of his certainty in the identification,[4] and the time between the observation and the identification, support a finding that the identification was reliable. J.S. described a shorter black male with a white hat and dark clothes who threw a gun into the ditch, and whose car was on Redbud. Defendant is five foot, eight inches tall, which is shorter than an average male. Defendant is a black male and otherwise matches the description given. He later admitted he had a white hat and had put it in his car. Officers recovered a gun from the ditch, and defendant's car was parked on Redbud. Most significantly, J.S. did not hesitate in identifying defendant at the scene. Moreover, J.S. was careful to note the missing white hat. This suggests to me that J.S. was not simply agreeing with the police to identify anyone they happened to have in custody, but was careful to note that there was a difference between the man before him and the man he saw dispose of the gun.

Finally, the show-up identification occurred approximately one-hour and 33 minutes after J.S. made the 9-1-1 call describing his observations. I find that to be a

---

[4] In assessing the certainty of J.S.'s identification, I have not considered the statements he made in the recorded phone calls (Exhibit 2 and 3). These statements were made a month after the fact, after officers questioned J.S. further, and after J.S. became aware the government had charged defendant. Because psychological influences such as choice-supportive bias or memory bias, or information learned from the officers or other sources, may have influenced J.S.'s later perceptions, I gave these latter assertions no weight.

reasonably short period of time.[5] *See, e.g.*, *Biggers*, 409 U.S. at 200-01 (identification of rape suspect seven months after crime did not violate due process); *United States v. Wilson*, 787 F.2d 375, 386 (8th Cir. 1986) (finding identification reliable where identification was made four months after the event); *United States v. Hammond*, 666 F.2d 435, 440 (9th Cir. 1982) (finding a week lapse between the observation and the show-up was "not long enough to indicate clear unreliability"); *United States v. Seizys*, No. 8:14CR409, 2015 WL 5883188, at *14 (D. Neb. Oct. 8, 2015) (finding that a two-hour delay between the crime and the show-up was "relatively short"); *United States v. Arruda*, 757 F. Supp.2d 66, 70 (D. Mass. 2010) (finding identification reliable even though ten days had passed since the initial observation); *United States v. Schau*, No. CR92-4010, 1992 WL 12019706, at *6 (N.D. Iowa Jul. 27, 1992) (finding delay of two hours between the crime and the show-up identification constituted "little lapse of time").

Under the totality of the circumstances, I find that the show-up identification that occurred in this case carries sufficient indicia of reliability that it should not be suppressed under the Constitution. I do not find, in other words, that the identification in this case gave "rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384-85 (1968). This does not mean, however, that a jury is precluded from finding that the identification lacks sufficient reliability to find defendant guilty beyond a reasonable doubt. "The Constitution . . . protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting introduction of the evidence, but by affording the defendant means to persuade the jury

---

[5] The government presented evidence of the reason for the length of time and argued that the good cause for the delay was important. I find the reason for the delay irrelevant. The length of delay is important only with respect to the witness's perception. *See United States v. Gerard*, 781 F. Supp. 479, 482 (E.D. Texas 1991) (emphasizing the importance of the length of time because it is relevant to the degree to which the prior observation of the suspect was "fresh in her mind").

9

that the evidence should be discounted as unworthy of credit." *Perry v. New Hampshire*, 565 U.S. 228, 237 (2012) (involving an allegation that an identification procedure violated the defendant's due process rights). It should be up to the jury in this case to determine whether J.S. saw defendant dispose of the gun.

## IV.  CONCLUSION

For the foregoing reasons, I respectfully recommend that defendant's motion be **DENIED**. Objections to this Report and Recommendation in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Crim. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**IT IS SO ORDERED** this 4th day of December, 2017.

_____
C.J. Williams
Chief United States Magistrate Judge
Northern District of Iowa